```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA      :    CRIMINAL ACTION
                              :
           v.                 :
                              :
EDWARD McCUSKER               :    NO. 09-771 - 1
```

MEMORANDUM

McLaughlin, J.                                    May 4, 2015


   Edward McCusker was indicted along with his wife,
Jacqueline McCusker, and three others for conspiracy to commit
mail or wire fraud, mail fraud, wire fraud, and conspiracy to
launder money all in connection with a foreclosure relief
program.  Mr. McCusker argues that his sentence should be vacated
pursuant to 28 U.S.C. § 2255 because his counsel had an actual
conflict of interest that adversely affected her performance.
The Court will deny the petition.

   The Court was closely involved in this case from
indictment through sentencing.  Mr. and Mrs. McCusker went to
trial while the other three defendants pled guilty.  Counsel for
Mr. McCusker litigated this case vigorously and effectively.  She
fought hard for discovery and aggressively represented Mr.
McCusker at trial.  Although Mr. McCusker was convicted at trial,
his counsel did an excellent job of undercutting the government's
position on the loss amount.  The evidence elicited at trial from
the homeowners contributed greatly to the reduced loss amount

that formed the basis of the guideline range.  Mr. McCusker's
counsel's vigorous representation continued through the
sentencing at which the Court accepted many of the defendant's
arguments concerning the guideline calculation and sentenced Mr.
McCusker to a sentence below the reduced guideline range.

I.   Background

        On December 8, 2009, a grand jury returned an
indictment charging Edward McCusker, Jeffrey Bennett, Stephen
Doherty, John Bariana and Jacqueline McCusker with one count of
conspiracy to commit mail or wire fraud; four counts of mail
fraud; six counts of wire fraud; and one count of conspiracy to
launder money, all relating to a foreclosure relief program.

        As shown at the trial, the essence of the foreclosure
relief program was that Doherty, who was a partner of Bennett in
Bennett & Doherty law firm, First County Abstract, and First
County, LLC, referred to Mr. McCusker people who were subject to
foreclosure proceedings and Sheriff's Sales.  Mr. McCusker or
Bariana would explain the program to the homeowner.  The program
was that one of the McCuskers or Bariana would buy the property
and lease it back to the homeowner.  After a certain amount of
time, it was expected that the homeowner would get back on his
feet financially and would buy back the property.  The McCuskers
or Bariana would get a mortgage on the property and pay the

mortgage, insurance and taxes during the leaseback period.  The homeowner would pay rent during this period to the McCuskers or Bariana.  The closings would take place at the title company owned by Bennett and Doherty, and Bennett would act as the title closing attorney.  In the course of the program, the defendants used false documents including forged sale agreements, lease agreements, and loan applications.

On December 15, 2009, Dennis J. Cogan, Esquire, entered his appearance on behalf of Edward McCusker, and Christopher Warren, Esquire, entered his appearance on behalf of defendant's co-defendant and wife, Jacqueline McCusker.  On January 22, 2010, Lynanne Wescott, Esquire, entered her appearance on behalf of defendant Edward McCusker as retained counsel, and Hope Lefeber, Esquire, entered her appearance on behalf of defendant Jacqueline McCusker as retained counsel.  On February 3, 2010, Mr. Cogan withdrew his appearance on behalf of Edward McCusker and Mr. Warren withdrew his appearance on behalf of Jacqueline McCusker.

Also on February 3, 2010, Jacqueline McCusker proffered with the government.  Mrs. McCusker asserted that she was a nurse in 2004.  She started to learn and become involved in the mortgage business when Mr. McCusker became so ill that Mrs. McCusker had to drive him to and from his office.  She stated that when Mr. McCusker was in the hospital, he worked from the

hospital bed, and mostly talked with John Bariana so that Mr. McCusker would not involve her in "his business."

Defendants Bennett and Doherty pled guilty in February 2010.  On March 19, 2010, Mrs. McCusker moved to sever her trial from her husband, asserting that she intended to testify, and that her testimony would incriminate her husband, defendant Edward McCusker.  On April 6, 2010, the Court scheduled trial for October 4, 2010.  On August 25, 2010, defendant John Bariana plead guilty.  On September 13, 2010, Mrs. McCusker withdrew her motion to sever her trial.

On October 4, 2010, Ms. Wescott filed numerous pretrial motions on behalf of Edward McCusker, including a motion to bar "inflammatory language," and to bar "forged documents."  After the jury was selected for the October 4, 2010, trial, the trial was delayed due to the health of Mr. McCusker.  Ms. Wescott continued to file numerous motions on his behalf, as well as join in motions filed by counsel for Jacqueline McCusker.  The McCusker defendants jointly submitted numerous assertions to the Court regarding discovery disputes, and the Court addressed these items in conferences in chambers.  Ms. Wescott also successfully petitioned the Court to delay the sentencing of co-defendants Bennett and Doherty until after Mr. McCusker's trial to avoid any Guidelines determinations that would be detrimental to Mr. McCusker.

Although Mr. McCusker claims in his § 2255 petition
that he told attorney Wescott not to have any contact with his
wife from pre-trial through sentencing, his own exhibits show
that he, his wife, and their attorneys adopted a joint defense
strategy both for the trial and for post-trial proceedings.  As
early as August 27, 2010, Mr. McCusker both initiated and
participated in email conversations with his wife, attorney
Wescott, and attorney Lefeber discussing issues in the case; they
also jointly hired experts, Bill Fox and Bob Gillespie, whose
emails to Ms. Lefeber were sent to Mr. McCusker.  Pet'r's Mot.
60-62, 73-74, 76-83, 88, 90-93, 95-99, 106-15, 117-122.  Mr.
McCusker received the electronic discovery that the government
sent to counsel and sent his analysis of one of the hard drives
to counsel.  These email conversations continued even after the
2011 jury trial, as Mr. McCusker, his wife, and their attorneys
continued to cooperate during the post-trial motion stage of the
proceedings.  Pet'r's Mot. 57-58, 100, 102, 104.  The only
evidence provided by Mr. McCusker that indicates any conflict
between him and his wife occurred shortly before the petitioner's
sentencing hearing – well after the jury returned a guilty
verdict against him.  Pet'r's Mot. 38, 56, 63-69.

On May 31, 2011, a jury trial began for both Mr.
McCusker and Mrs. McCusker, which lasted sixteen days.  The
defendants presented a unified defense strategy.  Their

overarching theme was that the foreclosure relief program was a reasonable program designed to help people who had gotten themselves in debt.  Under the defense theory, the plan had been vetted by attorneys Bennett and Doherty and fairly explained to the homeowners.  As part of this, they elicited testimony from government witnesses that the McCuskers had offered work to the homeowners or allowed them to delay payment, and that all the banks were repaid.  They vigorously cross-examined John Bariana, the government witness who specifically testified that Mr. McCusker and Mrs. McCusker had both knowingly submitted fraudulent documents to lenders.

Neither Edward McCusker nor co-defendant Jacqueline McCusker testified.  On June 21, 2011, the jury returned a verdict of guilty on all counts charged, Counts 1 through 11 and Count 15, against Edward McCusker.  The jury returned a verdict of not guilty as to Jacqueline McCusker as to Count 5, and found her guilty on the remaining counts.  Ms. Wescott moved for acquittal on all counts.  Her motion was successful as to Counts 9 and 11, based on the Court's finding that the government had not proved that the related wires had been transmitted interstate.

After conviction, the Court required briefing and hearings regarding the loss amount for the fraud and money laundering scheme.  Although the McCuskers were convicted at

6

trial, the work they did during the trial in challenging the government's narrative about loss suffered by the homeowners led to a very reduced loss amount from the $14 million loss figure that the government had been claiming throughout the pretrial proceedings.[1]  See the Court's Memorandum on the loss amount dated November 14, 2013 (Docket No. 333).  During the trial, both Ms. Wescott and Ms. Lefeber did an excellent job of undercutting the government's view of the loss amount.  Id.

Post-trial, the government proposed a loss amount of between $1 million and $2.5 million.  Ms. Wescott joined in submissions by Jacqueline McCusker to oppose the figure.  The Court also held hearings on the loss figure at which counsel for all defendants argued for a lower loss figure.[2]  The Court ultimately determined a loss figure of $400,000 to $1 million.

---

[1]   When the case was first indicted, the government referred to it as a $14 million loss case.  Bariana's plea agreement stipulated to a base offense level of 7 and fraud loss between $7 and $20 million.  Bennett's plea agreement did not contain a stipulation to loss amount.  Doherty pled guilty without a plea agreement.

[2]   In April 2013, in the middle of this process, Mr. and Mrs. McCusker separated.  In July 2013, Jacqueline McCusker sought a Protection from Abuse Order against Edward McCusker, but later withdrew it.  Despite the separation, counsel for the McCuskers continued to present a joint defense, working together to attempt to reduce the loss figure for Sentencing Guidelines purposes, which would assist both Edward McCusker and Jacqueline McCusker.  According to the emails that Mr. McCusker submitted with his pro se petition, he and Mrs. McCusker continued to communicate about the joint defense, with occasional custody/financial disputes arising.

7

On October 9, 2013, the United States Probation Office ("USPO") issued a preliminary presentence report.  The USPO calculated a base offense level of 8, and added the 16 levels set forth by the Court's loss figure of $400,000 to $1 million, for a total of 22.  The USPO then added a 2 level enhancement for money laundering, a 2 level enhancement for sophisticated money laundering, a 2 level enhancement for vulnerable victims, a 2 level enhancement for the large number of vulnerable victims, a 4 level enhancement for role in the offense, and a 2 level enhancement for abuse of trust.  In total, the USPO calculated a Total Offense Level of 36.  Because of Mr. McCusker's prior convictions, his criminal history category was III, resulting in a Sentencing Guidelines Range of 235 to 293 months.

In response to the presentence report, Ms. Wescott argued on behalf of Mr. McCusker against each of the enhancements found by the USPO.  Additionally, she argued that the offense conduct set forth in the PSR was incorrect, challenging it sentence by sentence.  Ms. Wescott produced the docket sheets for Mr. McCusker's prior convictions, and asserted that the docket sheets did not reflect that Mr. McCusker had had counsel, and therefore, without proof of counsel, argued that they could not be used in his criminal history category.  Ms. Wescott coordinated with counsel for Mrs. McCusker at sentencing, with each attorney seeking the right to take part in the sentence

proceedings of the other defendants, in order to ensure that this Court did not make adverse findings related to offence conduct against one of the McCuskers during one of the other hearings. The Court modified the schedule of the sentencing proceedings in response to these requests.

Neither of the McCuskers spoke against the other McCusker during the sentencing proceedings.  However, the government submitted Mr. McCusker's prior civil testimony in which he described his role in this matter.  In that sworn testimony, Mr. McCusker asserted that he and John Bariana (not Jacqueline McCusker) were responsible for the mortgage side of the deals, and attorneys Bennett and Doherty were responsible for devising the scheme and drafting the legal paperwork and the closing documents.  (Docket #359).

At Mr. McCusker's initial sentencing hearing, Ms. Wescott stated that if the Court was choosing which person to send to jail, Mr. McCusker or his wife, Mr. McCusker requested that he be the one to go to jail rather than Mrs. McCusker.  The Court offered Mr. McCusker the opportunity to allocute on his own behalf.  Ms. Wescott recommended that Mr. McCusker not speak, in order to avoid compromising his appellate rights.  However, Mr. McCusker stated that he wanted to "paint a scenario of what the mortgage business was like at that time."  He then gave a statement on his own behalf, explaining that he never intended to

hurt anyone, and that the failure of the program was the result of the collapse of the sub-prime market, rather than a flaw in the program itself.  He acknowledged that he was the one who calculated the payments that the homeowners would have to pay, and that he had added in a cushion, and that it was always a surprise when the payments at the closing table were higher than he had projected.  He stated that he was the one who had to be the bearer of bad news.  He asserted that he had reviewed the discovery in the case in advance of sentencing, and he had learned through the discovery for the first time that Bennett and Doherty were diverting funds to themselves.

When Mr. McCusker addressed the Court at his sentencing, he did not tell the Court that he had any disagreement with his counsel, or that he believed his counsel had a conflict of interest.  Finally, rather than asserting that he had been unable to review the discovery, he specifically told the Court that he had reviewed it.

At the conclusion of the proceedings, the Court rejected, in significant part, the PSR as it was initially prepared by the USPO.  The Court declined to make any enhancements based on victim impact statements of persons who were not subject to cross examination and rewrote the offense conduct based exclusively on the witnesses who testified and were cross examined at trial.  The Court ordered the revised

description to be substituted for the offense conduct initially prepared by the USPO.  The Court rejected most of the offense level enhancements found by the USPO and, instead, found that Mr. McCusker's total offense level was 26: 22 based on the fraud loss amount previously found by the Court, plus 2 levels for money laundering, plus two levels for a vulnerable victim enhancement based on the trial testimony.  The Court declined each of the other enhancements.

As a result, based on a 26/III, the Court found that the Sentencing Guidelines Range was 78 to 97 months.  The Court then departed from the Guidelines Range by more than 20% below the bottom of the Guidelines range, to a sentence of 60 months. The Court asserted that Mr. McCusker had played a "central role," based on the testimony of the homeowners and co-defendant John Bariana.  Based on this role, the Court considered an aggravated role for Mr. McCusker.  However, because he was ill for a significant period of time, the Court declined to assign him such a role.

The Court imposed a sentence of 60 months.  The Court explained the basis for the sentence as follows:

> Mr. McCusker's role was central.  I came very
> close to giving, as I said, Mr. McCusker the
> aggravated role enhancement, but because he
> was ill for -- through so much of it and out
> of the picture I could not find by a
> preponderance of the evidence that he was the
> leader to distinguish him enough from Mr.
> Bariana.

But he did come up with it, probably was the brains behind it with the help of Mr. Doherty and Mr. Bariana.  I don't know to what extent Mr. Doherty was actually involved in the details that caused the main problems here, but I don't think probably I ever will know.

Mr. McCusker talked to many of the homeowners to start with.  It's not clear to me how much he had to do with the false documents going in, but no doubt he knew about them, of course, and the false HUD-1s he knew about.

So that's the nature and circumstances of the offense.

Now, the person before me, of course, is not just those crimes.  He's a family man.  I have read everything, but there are two main points, I think, about Mr. McCusker's situation that I especially consider.  One is his illness.  I know he's been ill.  I can consider that.  There's no dispute about it, and I take that into consideration, and I know that -- that prison may be more difficult for him because of that.

I consider him, sorry to say, and have to consider, and this does cause me great pause, his prior record, and especially because it involves similar issues to what we have here.  The prior record, bad checks, prescriptions by forgery, identity theft, theft by deception.

So I have the same crimes, similar crimes, not, of course, as serious as this, but similar crimes.  And as I said, I have considered all the submissions from the Bureau of Prisons and from Ms. Wescott doing her normal thorough job concerning the situation in prison for him.

I'm concerned, as well, that Mr. McCusker got his wife involved in this, jeopardizing her and his family in doing it.

> The Court must consider punishment, rehabilitation and deterrence.  For the Court protection of the public is so paramount, and I wish I could say that I felt, Mr. McCusker, that you would not commit any more crimes.  I wish I could.
>
> I can say that, I think, with probably everybody else involved in this, but I'm not sure, and that's because of the prior record. I do fear recidivism here.  I have to tell you.
>
> And I have to consider general deterrence, as well as specific deterrence.  I also have to consider all the defendants when I'm sentencing.  That's why I have the two phases to get a clearer picture.
>
> For all of the reasons I just stated, as well as the reasons given in my earlier decisions on loss, on the guidelines, on my judgment of acquittal decision -- I talked about this case a lot -- I propose to sentence Mr. McCusker to 60 months' incarceration, three years of supervised release, $1,000 special assessment, and we have to talk about forfeiture.  That is what I propose to do.

Transcript, March 6, 2014, pages 22-24. The judgment was entered on March 12, 2014.  Docket #411.

On March 17, 2014, Mr. McCusker filed a pro se notice of appeal.  On April 4, 2014, Mr. McCusker filed a pro se 36-page motion to vacate/set aside/correct sentence (2255) and attached 168 pages of exhibits, including emails and texts between himself and variously Ms. Wescott, Ms. Lefeber and Jacqueline McCusker. This Court dismissed the 2255 motion due to the pendency of the appeal.  Mr. McCusker sought reconsideration and a delay of his self-surrender date which were also denied.

On April 11, 2014, the United States Court of Appeals for the Third Circuit appointed the federal community defender's office to represent Mr. McCusker. On April 30, 2014, Mr. Kenneth Young and Ms. Christina DiEdoardo filed notices of appearance as retained counsel on behalf of Mr. McCusker in the Third Circuit. On May 22, 2014, Mr. Charles Peruto filed an appearance in that court on behalf of Mr. McCusker. On October 2, 2014, Mr. McCusker, through Mr. Peruto, moved to withdraw the appeal. The appeal was dismissed by the Third Circuit on the same day.

II. <u>Discussion</u>

Although Mr. McCusker's main argument for ineffective assistance of counsel is that his attorney had an actual conflict of interest, the Court will start its analysis with a discussion of the <u>Strickland</u> standard that generally governs the requirements for a finding of ineffective assistance of counsel under the Sixth Amendment. The Court will then discuss whether counsel had an actual conflict of interest.

To establish ineffective assistance of counsel, Mr. McCusker must show both (1) that counsel's representation fell below an objective standard of reasonableness and (2) a reasonable probability that, but for counsel's deficient performance, the outcome would have been different. <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984). The court's review is

highly deferential, indulging "a strong presumption that
counsel's conduct falls within the wide range reasonable
professional assistance; that is, the defendant must overcome the
presumption that, under the circumstances, the challenged action
might be considered sound trial strategy." Id. at 689. A
convicted defendant making a claim of ineffective assistance must
identify the acts or omissions of counsel that are alleged not to
have been the result of reasonable professional judgment." Id.
at 690. In doing so, "the court should recognize that counsel is
strongly presumed to have rendered adequate assistance and made
all significant decisions in the exercise of reasonable
professional judgment." Id. (emphasis supplied). Strategic
decisions made after thorough investigation of the law and the
facts are virtually unchallengeable. Id. The reasonableness of
counsel's actions may be determined or substantially influenced
by the defendant's own statements or actions." Id. at 691.

Here, counsel's performance was clearly reasonable and
above the Strickland threshold. Through counsel, Mr. McCusker
and his wife embarked on a joint defense, designed to show that
the foreclosure relief scheme was reasonable, that they relied on
legal advice from attorneys Bennett and Doherty, and that any
flaws in the scheme were the fault of either the attorneys or
their partner, Bariana, the cooperating witness. This joint
defense strategy was a reasonable choice under Strickland,

compared to Mr. McCusker's newly-preferred strategy of attempting to shift blame to co-defendant Jacqueline McCusker.

First, Mr. McCusker had been involved in the mortgage business for nearly a decade before his wife became involved in the mortgage business.  Accordingly, a reasonable attorney could conclude that any attempt by Mr. McCusker to shift responsibility for the scheme to his wife would not be credible and would, therefore, be unsuccessful.  Moreover, Mr. McCusker had admitted the core facts related to his involvement in the foreclosure relief scheme during a voluntary sworn statement in civil litigation on June 23, 2008, and he had made clear that he, not his wife, had the primary dealings with attorneys Bennett and Doherty in devising and implementing the scheme.  Accordingly, Mr. McCusker's ability to contest his fundamental involvement in the scheme -- or to shift culpability to his wife -- was extremely limited.

Moreover, Mr. McCusker's wife had proffered with the government immediately after indictment, and had asserted that Mr. McCusker brought her into the scheme.  Jacqueline McCusker's assertions were consistent with cooperating witness Bariana's claims as it relates to the relative roles of Mr. McCusker and his wife.  Therefore, Ms. Wescott would reasonably conclude that neutralizing Jacqueline McCusker through a joint defense agreement was in Mr. McCusker's interest, in order to avoid the

16

classic "prisoner's dilemma" result of each defendant pointing a
finger at his co-defendant and effectively proving the
government's case from the defense table.  Additionally, at the
time of indictment through a time after trial, Mr. McCusker and
his wife were married and living in the same household with their
three children.

       Indeed, far from being "ineffective," counsel -- who by
Mr. McCusker's own admission had told him that he was going to
jail no matter what -- effectively opposed numerous enhancements
advocated by the USPO, resulting in a Sentencing Guidelines Range
of less than one-third of that advocated by the Probation Office.
Ms. Wescott then aggressively argued for variance from that
range.  The Court agreed, and varied downward more than 20% --
into a range that would have applied had the Court also given the
defendant credit for acceptance of responsibility and credit for
saving the government the cost of going to trial.

       The defendant argues that his Sixth Amendment right to
effective assistance of counsel was violated because his attorney
had an actual conflict of interest.  The alleged basis for the
actual conflict was that Mrs. McCusker's counsel, Ms. Lefeber,
referred defendant to Ms. Wescott with whom Ms. Lefeber had a
long term partnership in an investment property business and Ms.
Wescott went out shopping and to lunch with Mrs. McCusker and Ms.

Lefeber.  Ms. Wescott also talked on the telephone on numerous occasions with Mrs. McCusker.

In general, a defendant alleging a Sixth Amendment ineffective assistance of counsel claim must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Mickens v. Taylor, 535 U.S. 162, 166 (2002) (quoting Strickland v. Washington, 466 U.S. 668, 685-86 (1984)).  There is an exception to this general rule: a defendant does not need to show a probable effect on the outcome "where assistance of counsel has been denied entirely or during a critical stage of the proceeding."  Id.  Such a situation is implicated when "the defendant's attorney actively represented conflicting interests." Id.; see also Cuyler v. Sullivan, 446 U.S. 335, 348-49 (1980). There must have been an actual, not theoretical, conflict, and that conflict must have actually affected the defendant's counsel's performance in order to fall under this exception. Mickens, 535 U.S. at 171-72; Sullivan, 446 U.S. at 348-49.

The Mickens Court expressly noted that it was not expanding the application of this exception to the general rule to situations not considered in precedent such as Sullivan and Holloway v. Arkansas, 435 U.S. 475 (1978).  Mickens, 535 U.S. at 174-76.  Both of those cases dealt with situations in which the defendant's counsel actively represented multiple defendants.

18

Sullivan, 446 U.S. at 350; Holloway, 435 U.S. at 490-91.  The
Mickens Court noted that the Courts of Appeals have applied this
exception to "all kinds of alleged attorney ethical conflicts,"
but that the extent of the exception remained an "open question."
Mickens, 535 U.S. at 174-76.

The Third Circuit has generally limited its application
of this exception to cases of multiple representation.  See,
e.g., U.S. v. Santarelli, 577 F.App'x 131 (3d Cir. 2014);
Government of Virgin Islands v. Zepp, 748 F.2d 125, 135 (3d Cir.
1984); U.S. v. Laura, 667 F.2d 365 (3d Cir. 1981).  The non-
multiple representation cases in which the Third Circuit has
applied this exception implicate the same concerns that exist in
multiple representation cases.  For example, in Zepp, 748 F.2d at
135-36, the Third Circuit held that there was an actual conflict
of interest when the defendant's attorney could be indicted for
the same crime as the defendant and was a witness for the
prosecution.  Just as in a case of multiple representation, the
loyalties of the defense counsel in Zepp were divided: it was
"unrealistic for [the] court to assume that Zepp's attorney
vigorously pursued his client's best interest entirely free from
the influence of his concern to avoid his own incrimination."
Id. at 136; cf. Tillery v. Horn, 142 F.App'x 66, 69 (3d Cir.
2005) (finding no actual conflict of interest where defense

counsel had represented a witness at a previous trial of a co-defendant).

As an initial matter, the defendant has not presented any facts to support a finding of an actual conflict. Neither a friendship between counsel representing husband and wife co-defendants nor a non-legal commercial venture between counsel for co-defendants rises to the level of an actual conflict. The fact that Ms. Wescott went out shopping and to lunch with Mrs. McCusker during a many months period when Mr. and Mrs. McCusker were pursuing a joint defense strategy is neither surprising nor objectionable. The Third Circuit has held that no conflict of interest existed in cases in which counsel for co-defendants had a closer professional relationship than existed in this case. See U.S. v. Sotomayor-Teijeiro, 499 F.App'x 151, 155-56 (3d Cir. 2012); Duncan v. Morton, 256 F.3d 189, 198 (3d Cir. 2001); U.S. v. Pungitore, 910 F.2d 1084, 1139-41 (3d Cir. 1990).

Nor is there evidence that Ms. Wescott's performance was actually affected by her relationship with Ms. Lefeber.

Mr. McCusker claims that Ms. Wescott rejected numerous viable defense strategies for reasons that are inexplicable but for a conflict of interest. First, the petitioner claims that his attorney should have advised him to plead guilty and testify against his wife. Apparently, Mr. McCusker thinks that he could have gotten a cooperation plea agreement from the government in return for testifying against his wife. The government

20

persuasively denies such possibility.  Mr. McCusker was the lead defendant in a complicated mail and wire fraud indictment.  He had already made a sworn statement in civil litigation in which he said that he and Mr. Bariana, not his wife, ran the mortgage broker aspect of the foreclosure relief scheme.  His wife had already proffered that she relied on her husband for all her activities in the foreclosure relief scheme.  Mr. McCusker had a significant criminal record for forgery and dishonesty while Mrs. McCusker had no criminal record.  It is not plausible that he could have received a cooperation plea agreement.  Mr. McCusker states that his first attorney advised him to plead guilty so he knew that he could and obviously chose not to.  This notion that Mr. McCusker would have pled guilty is also inconsistent with the volume of materials included with his petition that shows that he and his wife wanted to and did put on a joint defense.

Nor is it likely that Mr. McCusker would have received a lesser sentence had he pled guilty for the simple reason that the Court would not have had the benefit of hearing the homeowners testify and realizing that the loss amount was much lower than what the government required in the agreements of those who pled guilty pursuant to an agreement.  Mr. McCusker would no doubt have ended up with a much higher guideline range and, consequently, a higher sentence than what he received.  The

defendants who pled guilty received the benefit of the hard work
and excellent representation of his lawyer and his wife's lawyer.

Secondly, the petitioner claims that his counsel should
have called certain witnesses to testify on his behalf and
against his wife.  To the extent that these witnesses would have
testified about his poor health, he did put on the defense that
he was sick through much of the relevant time and was not in the
office.  The government did not even dispute this.  The notion
that the testimony of Mr. Bariana would have helped him is belied
by Mr. Bariana's testimony.  He was a cooperating witness for the
government and testified against both Mr. McCusker and Mrs.
McCusker.  As to the other witnesses, the Court does not see how
they would have helped the petitioner.  The Government
persuasively argues this in its opposition.

Thirdly, the petitioner argues that his counsel did not
give him discovery materials.  This argument flies in the face of
what the Court observed pretrial and during the trial about both
defendants' involvement with the discovery and with the emails
and other material included with the petition.  Mr. and Mrs.
McCusker had a joint defense strategy and both defendants
constantly communicated with both attorneys about trial strategy
and discovery.

Fourthly, the petitioner argues that his counsel talked
to his wife after he instructed her not to and wrongly refused to

22

call character witnesses on his behalf.  The instruction about talking to his wife came on March 3, 2014, after the evidentiary hearings on sentencing were complete and 3 days before the sentencing.  As to character witnesses, it may have been ineffective assistance to put them on in view of the defendant's prior convictions for crimes of dishonesty.

       An appropriate order follows.